IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JERRELL D. COBURN et al., individually and on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> DAIMLERCHRYSLER SERVICES NORTH AMERICA, L.L.C., d/b/a CHRYSLER FINANCIAL COMPANY, L.L.C., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) No. 03 C 00759 <br> ) <br> ) Judge Mark Filip <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OPINION AND ORDER

Jerrell Coburn, ("Coburn"), Vanessa Dampeer ("Dampeer"), Cassandra Haynes ("Haynes"), Nathan Murray ("Murray"), Elaine Sims ("Sims"), and Eddie Tobias ("Tobias") bring this action, individually and at least putatively on behalf of others similarly situated, against DaimlerChrysler ("Chrysler" or "Defendant").[1] Plaintiffs filed a four-count amended complaint (D.E. 6) that alleges that Defendant, in acting as a "creditor," unlawfully discriminated on the grounds of race and national origin in violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691(a) (Count I); engaged in discrimination based on race and national origin in violation of 42 U.S.C. § 1981 by prohibiting the free making and enforcing of contracts (Count

---

[1] In this opinion, Coburn, Dampeer, Haynes, Murray, Sims, and Tobias will collectively be referred to as "Plaintiffs." Since none of Defendant's presently-filed motions for summary judgment implicate Plaintiff Ernesto Marquez, who was added as a proposed named plaintiff with leave of court after the pending motions were filed (D.E. 179), this opinion does not address his specific claims.

II); engaged in discrimination based on race and national origin in violation of 42 U.S.C. § 1982 by prohibiting people from purchasing and holding personal property because of their race or national origin (Count III); and violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* (Count IV). Judge Castillo dismissed Count IV without prejudice in June 2003. (D.E. 34.) Defendant has moved, pursuant to Federal Rule of Civil Procedure 56, for summary judgment against all Plaintiffs. As explained further below, Defendant's summary judgment motion as to Plaintiff Sims is granted. Defendant's summary judgment motions as to the remaining Plaintiffs are denied.

## I. FACTS[2]

The facts relating specifically to the issues implicated by the summary judgment motions are discussed at length in the discussion section of the opinion. In the interest of relative brevity, this section provides simply an overview of the facts as they relate to each Plaintiff's respective situation.

### A. The Plaintiffs and Their Respective Transactions

#### 1. Jerrell Coburn

Jerrell Coburn, an African-American male, bought a 2002 Jeep Grand Cherokee from the Marquette Chrysler Jeep Dealership ("Marquette"), which is located at 6515 South Western Avenue in Chicago, Illinois, in June 2002. (D.E. 101 ¶ 1; D.E. 133 ¶¶ 1-2.) To procure the car,

---

[2] The relevant facts are taken from the Defendant's Local Rule 56.1 ("L.R. 56.1") statements of facts and exhibits and from Plaintiffs' responses to Defendant's statements of facts and Plaintiff's own statements of material facts. Where the parties disagree over relevant facts, the Court sets forth the competing versions. The Court, as it must, resolves genuine factual ambiguities in the respective Plaintiff's favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

Coburn signed a 72-month retail installment contract with an annual percentage rate of 8.75 percent with Marquette. (D.E. 101 ¶ 1.) In addition, Coburn received a $3,000 manufacturer's rebate on his purchase. (*Id.*) For the Jeep Mr. Coburn purchased, the manufacturer offered a special promotional rate program through two companies: Chrysler Financial (referred to as "Chrysler" herein) and Chase Automotive Finance. (*Id.* ¶ 5.) The lower, subsidized, promotional rate—which often is referred to in the briefs and in the industry as "subvented financing"— depended on, among other factors, the particular type of car being sold, the length of the financing contract at issue, and rebate rules relating to the particular vehicle in question at the time of the sale. (*Id.*) To qualify for the subvented rate program for the 2002 Jeep Grand Cherokee, two requirements had to be met: (1) the contract had to be for a term of sixty months or less, and (2) the buyer could not receive a manufacturer's cash rebate. (*Id.*) Coburn's contract did not qualify for the subsidized financing program because it failed both requirements. (*Id.* ¶ 6.) Defendant maintains that it never received from Marquette "any credit application" for Coburn's June 2002 purchase and that Marquette never submitted the application. (*Id.* ¶ 4.) Coburn claims, however, that Marquette personnel called in his application to Chrysler, where it was turned down for illicit and discriminatory reasons. (D.E. 133 ¶ 4.)

2.     Vanessa Dampeer

Vanessa Dampeer, an African-American female, purchased a 2002 Chrysler Sebring from Marquette in February 2002. (D.E. 103 ¶ 1; D.E. 135 ¶ 1.) The contract Dampeer signed with Marquette had an annual percentage rate of 11 percent for a 72-month term. (D.E. 103 ¶ 1.) Upon purchasing the automobile, Dampeer received a $1,500 manufacturer's rebate and a $500 Auto Show rebate. (*Id.*) To secure financing for Dampeer's purchase, Marquette prepared two

applications. (*Id.* ¶ 4.) Both overstated her monthly income. (*Id.*) Both parties agree that Dampeer did not satisfy the prerequisites for the subvented rate because her contract was in excess of sixty months and because she received the cash rebates. (*Id.* ¶ 6.) Ultimately, Chrysler refused to buy Dampeer's contract (in other words, to finance her purchase) at any rate. (*Id.* ¶ 2.) Defendant's computer program indicated that Defendant would not give another auto loan to Dampeer because she had an open retail installment contract with Ford that required monthly payments of $600 and because she already had a high debt-to-income ratio. (*Id.*) Four other companies refused to purchase Dampeer's contract as well. (*Id.* ¶ 3.) Another financial company, ICUL Service Corporation, ultimately purchased Dampeer's contract with a "buy rate" of 8 percent and a proviso that the annual percentage rate in Dampeer's retail installment contract could not exceed 11 percent. (*Id.* ¶ 1.) Defendant maintains that even if it had been willing to bid for Dampeer's contract, under the circumstances presented by her application, Chrysler would not have done so below its standard rate, which at the time was 8.75 percent, or three-fourths of a point higher than the rate Dampeer received through ICUL. (*Id.* ¶ 7.)

### 3.   Cassandra Haynes

Cassandra Haynes, an African American female, purchased a 2002 Jeep Grand Cherokee from Marquette in February 2001. (D.E. 105 ¶ 1; D.E. 131 ¶ 1.) The contract Ms. Haynes signed with Marquette had a 10 percent annual percentage rate for a 72-month term, and it included a $2,750 rebate on her purchase. (D.E. 105 ¶ 1.) At the time Ms. Haynes purchased her car, Ms. Haynes did not qualify for the subvented rate program because of the particular manner that her transaction was structured. (*Id.* ¶¶ 6-7.) Prior to applying for financing with Defendant, Haynes applied to at least four other companies, and all "rejected the Haynes application completely."

(*Id.* ¶ 5.) Marquette submitted a credit application on behalf of Ms. Haynes to Chrysler, and this application overstated her monthly income by roughly $2,000 a month. (*Id.* ¶ 4.) The application also contained a contract balance of $30,722, or almost $3,000 more than the wholesale cost of the vehicle, which was the only collateral proposed. (*Id.* ¶ 2.) Haynes contends that Chrysler "rejected in its entirety" Haynes's application, or, if Defendant approved it, then the approval was never communicated to Marquette. (D.E. 131 ¶ 3.) In contrast, Chrysler claims that it "conditionally approved" buying Haynes's contract, provided that Marquette would reduce the contract balance to $28,722. (D.E. 105 ¶ 3.) In other words, Defendant wanted Haynes to make a larger down payment before it would finance her. (*Id.* ¶ 8.) Chrysler also claims that even if it had accepted Haynes's contract, it would have used its "standard buy rate," which would have been 9.6 percent for the $30,722 contract balance and 8.75 percent for the reduced, $28,722 balance, such that either of these rates were higher than the 8 percent buy rate Marquette received from ICUL. (*Id.* ¶ 8.)

4.    Nathan Murray

Nathan Murray, an African-American male, bought a 2002 Jeep Liberty from Marquette in June 2002, with his mother, Mamie Murray, as a co-signer. (D.E. 107 ¶ 1; D.E. 135 ¶ 2.) Murray paid for the car with a finance contract that had a 9.95 percent annual percentage rate for 72 months. (D.E. 107 ¶ 1.) Defendant was not offering any subvented finance rates for the 2002 Jeep Liberty in June 2002. (*Id.* ¶ 6.) Defendant applied for financing with Chrysler. Defendant received Murray's application and attempted to get a credit bureau rating for him. Upon doing so, Defendant discovered that Plaintiff's credit history included "uniformly negative information," including a very short credit history and three unpaid debts that had been submitted

5

to collection agencies. (*Id.* ¶ 2.) The Marquette credit application overstated Murray's monthly income: it alleged that he made $4,300 per month, when it actually averaged between $2,915 and $3,300. (*Id.* ¶ 5.) Defendant claims that it rejected Mr. Murray's application because of his poor credit history and the fact that the contract amount was 20 percent higher than the wholesale value of the car involved. (*Id.* ¶ 2.) At least two other companies also refused to buy Murray's contract because of the insufficient credit history or credit experience of both Mamie and Nathan Murray. (*Id.* ¶¶ 3-4.) Ultimately, Harris Bank bought Murray's contract for 7.25 percent. Defendant maintains that even if it had been willing to finance Murray's purchase, it would have done so at its standard rate, which for him, based on his represented credit history and experience, could be no lower than 9 percent—or nearly 2 percent more than the rate Murray actually received. (*Id.* ¶ 7.)

### 5. Elaine Sims

Elaine Sims, an African-American female, purchased a 2001 Chrysler 300M from Marquette on November 8, 2001. (D.E. 109 ¶ 1; D.E. 132 ¶ 1.) The contract Sims signed with Marquette had an annual percentage rate of 8.64 percent for a 72-month term. (D.E. 109 ¶ 1.) Both sides agree that Sims did not qualify for a subvented financing program, at least as of the time of the transaction at issue. (*Id.* ¶ 5; D.E. 132 ¶ 5.) Instead, she allegedly sought more traditional financing. (D.E. 132 ¶ 6.) Sims claims that Marquette personnel called Sims's application into Chrysler Financial, where it was turned down. (*Id.* ¶ 4.) Defendant asserts that Marquette never submitted any credit application to it, much less a completed one. (D.E. 109 ¶ 4.) Defendant also alleges that Sims's credit application (which she submitted to others) was inaccurate in material respects and her credit report also correctly stated that she had sixteen

6

revolving credit accounts that were between sixty and ninety days delinquent. (*Id.* ¶ 8.)
Defendant further claims that even if Sims's contract had been submitted to it, the best finance
rate she could have received from Chrysler was at the "standard rate," which, in her case and
concerning her vehicle, was 6.94 percent. (*Id.* ¶ 6.) Subsequently, ICUL Service Corporation
purchased the Sims contract from Marquette; ICUL's buy rate was 6 percent, with a proviso that
the annual percentage rate could not exceed 9 percent. (D.E. 109 ¶ 1.) To demonstrate its lack of
an improper motive in not financing Sims's purchase, Defendant points to two other pieces of
information: (1) two other companies refused to buy the Sims contract as written (*id.* ¶ 7); and
(2) Chrysler previously had purchased two earlier Sims vehicle contracts, in 1995 and 1998 (*id.* ¶
2).

      6.    Eddie Tobias

     Eddie Tobias bought a Chrysler Sebring from Marquette in June 2001. (D.E. 111 ¶ 1;
D.E. 135 ¶ 1.) His race and national origin are not mentioned in the parties' 56.1 filings. The
contract Tobias signed with Marquette had a 12.25 percent annual percentage rate for a 72-month
term, and it included a $1,000 manufacturer's rebate on his purchase. (D.E. 111 ¶ 1.) At the
time Tobias purchased the car, the manufacturer was offering a subvented rate program, but
Tobias did not qualify for the subvented rate program because of the way his particular
transaction was structured. (*Id.* ¶¶ 7-8.) Tobias also applied for financing with several other
companies, and many rejected his application due to "delinquent credit obligations" and
"insufficient collateral." (*Id.* ¶ 4.) Marquette submitted a credit application to Defendant
concerning the Tobias transaction, and at the time of the submission, the proposed contract
balance (*i.e.*, the proposed finance amount net of any down payment) was some $8,200 more than

the wholesale cost of the Sebring. (*Id.* ¶ 2.) Defendant "conditionally approved" buying Tobias's contract, provided that Marquette would reduce the contract balance to $26,299. (*Id.* ¶ 3.) Put differently, Defendant wanted Tobias to make a larger down payment before it would finance him. (*Id.*) Defendant claims that if Tobias would have accepted the conditions of the approval, given his reported financial condition, he would have been entitled to a "standard buy rate" of 8.25 percent. (*Id.*) Even if Defendant had accepted the contract proposed by Marquette, to finance a balance of $30,999, the standard rate Tobias would have been offered was 9.25 percent, higher than the rate Tobias eventually received. (*Id.* ¶¶ 1, 3, 9.) Ultimately, Harris Bank bought the 72-month Tobias contract at a buy rate of 8.9 percent. (*Id.* ¶¶ 1, 9.)

B.    Overarching Allegations of Racism

1.    Plaintiffs' View

Plaintiffs argue that Chrysler's finance department in Chicago was infected by abject and pernicious racism. In support of this view, Plaintiffs allege an extensive number of tasteless, offensive, and repulsive general statements and slurs made about African-Americans by certain officials in Chrysler's Regional Office in Lisle, Illinois. (D.E. 132 ¶ 3.) Allegedly this racism translated into a "clearly articulated" Chrysler policy of "refusing to provide financing to African-American customers from the 'South Side' minority neighborhoods and dealerships, such as Marquette." (D.E. 131 ¶ 3; D.E. 132 ¶ 3; D.E. 133 ¶ 3; D.E. 135 ¶ 5.) Plaintiffs rely considerably on the testimony of Gerald Gorman, the owner of the Marquette dealership, as well as a second dealership, in Midlothian, Illinois. (D.E. 132 ¶ 24.)[3]

---

[3] In a separate lawsuit filed in the Northern District of Illinois against Chrysler, *Ridge Chrysler Jeep L.L.C., d/b/a Marquette Chrysler Jeep and Sales, Inc., et al. v. Daimler Chrysler Services North America*, 03 C 760 (N.D. Ill. filed Feb. 4, 2003), Gorman has alleged that

The heart of Plaintiffs' complaint stems from incidents that began occurring on or about January of 2001 and continued through 2002. (*Id.* ¶ 3.) During this time period, Plaintiffs allege that two Zone Managers, Erv Sirovy and Ben Boggs, manifested their race-based practices by repeatedly using abject racial slurs in the context of their dealings with Marquette's owner and/or employees. (*Id.* ¶¶ 3, 10.) Most notably, Plaintiffs claim that Sirovy stated that "my whole office knows that I don't buy nigger paper," which Plaintiffs interpret to mean that Sirovy meant that his employees understood that he did not finance contracts with African American customers. (*Id.*) Sirovy was eventually fired by Chrysler (apparently for unrelated reasons), before at least some if not most of the Plaintiffs' transactions at issue took place. Plaintiffs also offer evidence that another Chrysler employee, this time an analyst in Chrysler's Regional Headquarters, subsequent to Sirovy's firing, "was overheard asking a dealer if a certain credit applicant (none of the named plaintiffs in the instant action) was 'white' in an effort to determine the race of the applicant before making a credit decision." (*Id.* ¶ 12.)

Plaintiffs also point to Chrysler's computerized credit evaluation system, Automated Credit Evaluation ("ACE"). Apparently, ACE is designed to provide a colorblind assessment of customers' creditworthiness by looking at their financial condition and credit history and then "grading" them accordingly, between an "A+++," the highest possible score, and an "F." (*Id.* ¶ 14.) Plaintiffs assert, however, that the system is not colorblind. Specifically, they allege that the credit evaluation system can be set up differently for different dealerships by adding or amending

Chrysler Financial adopted an internal corporate policy of refusing to provide financing to non-suburban African-American car buyers, regardless of their creditworthiness, and then punished his Dealerships for refusing to go along with that discriminatory practice. In their respective Rule 56.1 statements of facts, Plaintiffs frequently cite to Gorman's verified complaint in *Ridge.*

the terms in the "Dealer Maintenance Tables," which controls how the ACE system is set up for any individual dealership. (*Id.* ¶ 14.) One of the fields for the Dealer Maintenance Tables is the "Performance out of Tolerance" field. (*Id.*) Manipulation of the terms in this field enables a Zone Manager to put a dealership on "Watch" status. (*Id.*) The effect of placing a dealership on "Watch" status is to subject any given dealership to increased scrutiny. (*Id.*)

Similarly, manipulation of the "Automated Decision Eligibility" field in the "Dealer Maintenance Tables," which "controls whether a given dealership will even be eligible for an automated credit evaluation," can mandate a manual review for all credit applications that come from a particular dealer. (*Id.* ¶ 15.) Plaintiffs suggest or at least imply that susceptibility to such individualized assessment at Chrysler's headquarters, combined with the racism of some Chrysler employees and supervisors, demonstrates both the potential for and sanctioning of "redlining" loan applications that come from dealerships located in predominantly minority neighborhoods. (*Id.*)

## 2. Defendant's Response

Defendant denies that racism played any role, or could have played any role or had any impact, in the treatment of the Plaintiffs. Defendant points out that much of the material Plaintiffs offer as evidence is clearly inadmissible—such as the substantive content of proffered newspaper articles and unsworn letters. Defendant also argues that the proffered testimony from the *Ridge/Marquette* case (in the form of the verified complaint in that case signed by Mr. Gorman) is inadmissible because it lacks credible foundation and reflects an improper compilation of several individuals' recollections (*i.e.*, not just the affiant's). (D.E. 165 at 13-15.) Defendant also maintains that even if the alleged statements were made, they had nothing to do

10

with the named Plaintiffs and on such basis are not properly considered. (*Id.* at 13.)

Defendant also objects to Plaintiffs' characterization of its ACE system. Defendant argues that Plaintiff has shown no evidence that the ACE system was used to discriminate against any customer, including any of the named Plaintiffs. (*Id.* at 36, 39.) First, Defendant asserts that Plaintiffs failed to show that there was a racial or ethnic component to the ACE system. To the extent ACE could theoretically be used in a discriminatory manner based solely on the fact that a party who wanted to could subject specific dealerships to manual review, Defendant alleges that there is no proof of any kind that ACE actually was used in such a manner.

Lurking in the backdrop of this issue are what the parties sometimes refer to as the "Marquette fraud deals." Specifically, in late 2000 and early 2001 (or prior to at least five of the six disputed transactions involving the Plaintiffs), Marquette appears to have submitted as many as several dozen fraudulent credit applications which were accepted by Chrysler. (*See generally* D.E. 113, Ex. DD ¶¶ 20-39 & Exs. 1 and 2.) At least at the present time, Mr. Gorman, the owner of Marquette, does not appear to dispute that the transactions indeed involved material and/or fraudulent misstatements. In this regard, he testified that the false statements must have come from either his employees or his customers; he denied any personal responsibility or culpability; and he suggested that he hoped any malefactor would be arrested. (*See, e.g.*, D.E. 205, Ex. 2 (Gorman Dep.) at 88-90, 123, 1009-12, 1020-21.) Chrysler appears to suggest that some, if not all, of the responsibility rests with Marquette because, in the diverse "fraud deals," customers were often falsely listed as being employed at one of four employers repeatedly listed and also because some of the "fraud deals" involved inflated invoices. (*See* D.E. 113, Ex. DD ¶¶ 25-26, 32 & Exs. 1; *see also* D.E. 205, Ex. 2 at 89 (Mr. Gorman conceding that the transactions

11

involving misstatements concerning the four false employers were "fraud deals"), 1020-21 (Mr. Gorman agreeing that altered invoices create misstatements concerning the amount of collateral involved in transactions).) As discussed below, Chrysler also points to evidence, often in the form of testimony from the Plaintiffs themselves, that there were various misstatements in the credit applications submitted by Marquette concerning Plaintiffs' transactions.[4]

Defendants also argue that Plaintiffs' "redlining" theory is incoherent because it is based on recordkeeping systems that do not have any ethnic or racial component. According to Chrysler, these systems operate on statewide and multi-state bases and thus have no relationship, actual or potential, to any particular neighborhood. (D.E. 165 at 42-43.)

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmovant cannot rest on the pleadings alone, but

---

[4] Both Mr. Gorman (in the *Ridge/Marquette* case) and the Plaintiffs (in this case) appear to be represented by the same legal team, an arrangement that appears to have been put in place, at least in the first instance, by Mr. Edward Verdolyak. Mr. Verdolyak was listed as the lead attorney for the respective plaintiffs in both cases when they were filed, and he signed both of the initial complaints. Mr. Verdolyak has since been disqualified in both cases—by Judges Castillo, Anderson, and Keys—as a result of his failure to rebut the presumption that he improperly obtained confidential and privileged information from Chrysler through his contacts with and representation of an administrative assistant in the Chrysler legal department who was assigned to work on this case. (Judge Keys also specifically discussed, as explained further below, other conduct of Mr. Verdolyak, in connection with his dealings with Mr. Gorman, that Judge Keys found "disconcerting" (D.E. 102 at 19) and "questionable on . . . many levels" (*id.*). By this arrangement, according to Judge Keys, Mr. Verdolyak expects to be paid some $840,000, in $10,000 monthly payments from 2000 through 2007, "in exchange for, essentially, nothing." (*Id.*) Judge Castillo denied Defendant's disqualification motions concerning the remainder of the Plaintiffs' legal team, without prejudice, as discussed further below.

must identify specific facts, *see Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a scintilla of evidence to show a genuine triable issue of material fact, *see Murphy v. ITT Educ. Servs., Inc.*, 176 F.3d 934, 936 (7th Cir. 1999) (citation omitted). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Mere "metaphysical doubt as to the material facts" does not amount to a genuine issue for trial. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant. *See* Fed. R. Civ. P. 56(c); *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). However, the Court is "not required to draw every conceivable inference from the record." *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004) (quoting *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003)). Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion. *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). The party opposing summary judgment may not rest upon the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 248. There is no genuine issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.*

## III.  DISCUSSION

### A.  Threshold Issues

Before engaging in a substantive analysis of the pending summary judgment motions, the Court briefly addresses a threshold argument advanced by the Plaintiffs. Plaintiffs maintain that

13

the Court should not analyze the specifics of Plaintiffs' individual transactions and claims to see if summary judgment is appropriate because Plaintiffs hope to maintain this case as a class action. (*See, e.g.*, D.E. 136 at 1.) According to Plaintiffs, evidence concerning "individual decisions or transactions" in which they respectively were involved is not relevant because the complaint purports to allege a class action. (D.E. 129 at 1.) This argument is respectfully rejected.

Precedent teaches that a plaintiff's status as a class representative (much less as a potential class representative) does not immunize the plaintiff from the fundamental requirement that the plaintiff must be able to establish each of the elements of the cause(s) of action alleged in the plaintiff's complaint. "Rule 23's requirements must be interpreted in keeping . . . with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right.'" *Amchem Products v. Windsor*, 521 U.S. 591, 613 (1997) (quoting 28 U.S.C. § 2072(b)); *accord In re Bridgestone/Firestone*, 288 F.3d 1012, 1020 (7th Cir. 2002) (instructing that "judges must resist" any temptations "to alter doctrine in order to facilitate class treatment" "so that all parties' legal rights may be respected"). Accordingly, precedent makes clear that the presence (or potential presence) of a class action does not alter a plaintiff's basic requirement of establishing all of the elements of any cause of action alleged in a complaint. *See, e.g., Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331, 340-44 (4th Cir. 1998) (discussing the elements of the causes of action that each putative class member would have to prove to recover); *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006, 1008 (11th Cir. 1997) (discussing the elements of the causes of action that each putative class member would have to prove in order to recover in a racial discrimination case); *accord* 28 U.S.C. § 2072(b)

14

(2004).

In addition, as a matter of law—and, in particular, of fact given the history of this case—there is nothing illicit about Defendant having moved for summary judgment on Plaintiffs' claims prior to resolution of the propriety of any class action treatment. The Seventh Circuit teaches that this method is permitted:

> It is true that Rule 23(c)(1) of the civil rules requires certification as soon as practicable, which will usually be before the case is ripe for summary judgment. But "usually" is not "always," and "practicable" allows for wiggle room. Class actions are expensive to defend. One way to try to knock one off at low cost is to seek summary judgment before the suit is certified as a class action. A decision that the claim of the named plaintiffs lacks merit ordinarily, though not invariably, . . . disqualifies the named plaintiffs as proper class representatives. The effect is to moot the question whether to certify the suit as a class action unless the lawyers for the class manage to find another representative.[5]

*Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995) (internal citations omitted). If a defendant proves successful in its summary judgment motion, and if no other party "step[s] forward to pick up the spear dropped by the named plaintiffs," a plaintiff then cannot prevail in a motion for class certification. *Id.* Caselaw reflects many instances in which summary judgment issues concerning putative name plaintiffs have been resolved before class certification is addressed. *See, e.g., Massey v. Zema Sys*, No. 95 C 3504, 1998 WL 708913, at

---

[5] Subsequently, Rule 23(c)(1) has been amended to require a court to rule on class certification "at an early practicable time," not "as soon as practical." Fed. R. Civ. P. 23(c)(1)(A). Precedent teaches that this change provides more flexibility concerning when to address the propriety of any class certification. *See, e.g., Weiss v. Regal Collections*, 385 F.3d 337, 347 n. 17 (3d Cir. 2004) ("Fed. R. Civ. P. 23 directs that certification be made 'at an early practicable time.' Fed. R. Civ. P. 23(c)(1)(a). This recent amendment replaced the language of the old rule: The former 'as soon as practicable' exaction neither reflect[ed] prevailing practice nor captur[ed] the many valid reasons that may justify deferring the initial certification decision.") (citing Fed. R. Civ. P. 23(c)(1)(a) Advisory Committee Notes; brackets in original; internal quotation omitted.). Accordingly, the amendment to Rule 23(c)(1) provides further support for the course followed here.

15

*4, 7-11 (N.D. Ill. Sept. 30, 1998) (Williams, J.) (granting summary judgment on all claims asserted by one plaintiff in case filed as putative employment discrimination class action); *Osborne v. AmSouth Bank*, No. 3:02-CV-577, 2003 WL 22025067, at *2-3 (M.D. Tenn. July 15, 2003) (granting summary judgment against putative named plaintiffs' claims in proposed auto financing discrimination class action); *Larson v. Evanston Northwestern Healthcare*, No. 98 C 0005, 1999 WL 518901, at *2-5 (N.D. Ill. July 19, 1999) (granting summary judgment against named plaintiffs' claims in putative class action under the Fair Debt Collection Practices Act, and collecting additional caselaw where summary judgment was resolved before class certification question); *Anderson v. Rizza Chevrolet*, 9 F. Supp. 2d 908, 912-16 (N.D. Ill. 1998) (granting summary judgment against named plaintiff's claims in putative class action against automobile dealer concerning car financing).

Although the propriety of addressing summary judgment issues prior to class certification is a matter that must be evaluated carefully in each given case, the fairness and sensibility of resolving the Defendant's numerous pending summary judgment motions in this instance is demonstrated by the history of this case. This Court inherited this case from Judge Castillo in March of 2004. Defendant filed its various summary judgment motions in May 2004. The parties thereafter experienced various discovery disputes, and this Court granted Plaintiffs additional time to take discovery that they believed was necessary to address the pending summary judgment motions. (D.E. 170.) In that order, the Court gave the Plaintiffs ten weeks additional time for discovery and granted Plaintiffs leave to amend or supplement their summary judgment responses that Plaintiffs had filed with their request for further discovery. (*Id.*) In that order, however, the Court also made clear that the Court intended to move forward on the

16

Defendant's pending motions and to "rule upon the propriety of summary judgment." (*Id.*)

Plaintiffs later conceded, in a subsequent filing, that, at a minimum, "it is clear that the Order

told them that, if they did not amend their responses to the summary judgment motions by

October 31, 2004," (which Plaintiffs indisputably did not do) that "the Court would rule on the

motions as they were briefed." (D.E. 197 at 6.) Plaintiffs further knew that they had not even

requested a briefing schedule on any class certification issues as of October 31, 2004. As a

consequence, there is no unfairness in proceeding in the first-come, first-served sequence that the

parties expected was in place. Under such circumstances, it hardly seems imprudent or unfair to

proceed in the expected fashion so as to address the pending summary judgment motions in the

order that everyone appreciated would be followed.[6]

B.  Substantive Summary Judgment Arguments

The Court accordingly proceeds to address the arguments in the respective summary

judgment motion relating to each Plaintiff. Defendant advances various arguments, some of

which apply to each of the Plaintiffs and some of which apply to only particular Plaintiffs.

---

[6] Plaintiffs' summary judgment responses were accompanied by requests for further discovery under Federal Rule of Civil Procedure 56(f). The Court granted those motions in substantial part, giving the Plaintiffs until October 31, 2004, to complete any further discovery. (D.E. 170.) While the summary judgment responses contain references to many purported Rule 56(f) issues, those issues are now moot. In the Court's Order, the Court noted that if Plaintiffs thought relevant discovery could not be obtained consistent with the October 31, 2004, deadline, Plaintiffs should file motions to compel and that if Plaintiffs did not file any such motions or supplemental briefing, "the Court will consider any discovery issues identified in the Rule 56F motions (and there are a number of potential discovery issues identified in the motions, many without great factual specificity) to be waived and the Court will rule upon the propriety of summary judgment on the basis of the record assembled and presented in the briefs and supporting materials filed to date." (*Id.*) Plaintiffs acknowledge that they filed no supplemental briefs or other briefs concerning additional discovery consistent with the October 31, 2004, timeline.

Chrysler asserts that its arguments entitle it to dismissal of all of the Plaintiffs' claims.[7]

1.    The Challenged Transactions Could Not Qualify for Subvented Financing, But That Does Not Preclude Plaintiffs from Proceeding in Any Fashion

Chrysler argues that various Plaintiffs did not qualify for subvented financing (as Plaintiffs repeatedly contend they should have in the Amended Complaint[8]), because of the way that each Plaintiff's particular car purchase was structured. The transactions were structured by Marquette salespeople and perhaps also the respective Plaintiffs (in terms of selecting whether each Plaintiff would receive any rebates, and if so, in what amount; as well as the length of the respective loans). No one alleges that Chrysler chose these terms for Marquette and Plaintiffs.

Chrysler explains that because of the way that Marquette and the Plaintiffs structured their respective transactions, the purchases were categorically ineligible for subvented financing through Chrysler because they violated multiple threshold prerequisites for such financing. For example, none of the challenged transactions involved financing agreements of 60 months or less. Chrysler establishes without meaningful dispute that no person—of any race, ethnicity, age or creed—could receive subvented financing, during the relevant time periods and for the relevant vehicles at least, if the term of the car loan extended beyond 60 months. (See, e.g., D.E.

---

[7] Briefing has proceeded on the assumption that the standard for analyzing the viability of the three counts is not materially variant, except in that the ECOA sometimes imposes higher hurdles. See, e.g., D.E. 107 at 9 (Chrysler asserting that "[i]n cases alleging credit discrimination, the pertinent legal standards" are generally "the same under each statute") (citing and quoting Latimore v. Citibank, 151 F.3d 712, 713 (7th Cir. 1998), which states that in credit discrimination cases, generally "[t]here is no reason to think that the answer will be different depending on the particular civil rights statute sued under").)

[8] (See, e.g., D.E. 180 ¶¶ 4 (discussing subvented or "special" financing offers), 15 (discussing 0% financing), 26 (discussing 0% financing), 141 (stating that Plaintiffs were wrongly denied subvented financing terms at 0%, 1.9%, or 2.9%).)

161 ¶ 6; D.E. 159 ¶ 5.)  Similarly, Chrysler establishes that, while Chrysler's various rebate/subvented financing eligibility criteria differed concerning the specific car purchases at issue, the purchases of each of the Plaintiffs could not qualify for subvented financing because of rebates they variously arranged with Marquette to receive.  Thus, for example, when Cassandra Haynes bought a 2002 Grand Jeep Cherokee in February 2001, she was ineligible for subvented financing if she took a rebate in excess of $1,000.  (D.E. 161 ¶ 7.)  Given that Marquette and Ms. Haynes arranged her purchase so that she received a $2,750 rebate, that fact alone independently disqualified her for the subvented terms that it is alleged she should have received.  (*Id.*) Similarly, when Ms. Vanessa Dampeer purchased her 2002 Chrysler Sebring from Marquette in February 2002, a different set of rebate rules applied to the purchase, but she nonetheless was ineligible for subvented financing terms because, at that time on that vehicle, subvented financing was unavailable if the purchaser received any cash rebate at all.  (D.E. 159 ¶ 6.)  Ms. Dampeer received two different rebates (one for $1,500 and a second for $500) in connection with her Marquette purchase, and as a result, this factor independently disqualified her from subvented financing eligibility.  (*Id.*)

Although Defendant has established that each of the Plaintiffs were ineligible for the subvented financing repeatedly discussed in the Amended Complaint because of the way that the respective vehicle deals were structured (as were *any* persons, of any race, ethnicity, age or creed who purchased under similar terms), the Court does not agree with Chrysler that this fact entitles Defendant to summary judgment.  Reading the allegations in the Amended Complaint generously in favor of Plaintiffs, it appears that they also allege that the Plaintiffs should have received more generous financing terms generally—in terms of perhaps down payment requirements or non-

subvented interest rates—than they received from Chrysler, as a result of their race. (*See* D.E. 180 ¶¶ 7, 16, 18.) Financing presumably can be negotiated along various diverse axes, irrespective of whether subvented financing (which perhaps involves fewer open-ended terms) is in play. Proving that a plaintiff was ineligible for subvented financing is not inconsistent with the idea that any alleged discrimination could have affected deal terms such as the down payment requirement, the interest rate, any co-signer requirement, trade-in requirements and terms, etc., for the particular transaction at issue. (The Court is at least prepared to proceed on that assumption in the absence of any record evidence to the contrary.) Accordingly, Defendant's argument that it is entitled to summary judgment against each of the Plaintiffs because they were ineligible for subvented financing is respectfully rejected.

> 2. The Court Cannot Conclusively Determine That There Is No Triable Issue Concerning Whether Alleged Prejudice Could Have Affected the Challenged Financing Transactions

Chrysler argues that summary judgment should be granted against each of the Plaintiffs because the record evidence conclusively establishes that Chrysler had legitimate business reasons for rejecting the respective Plaintiff's credit application (*e.g.*, D.E. 103 at 7-8; D.E. 107 at 11-12), or for treating the particular application in the manner that it was treated (D.E. 111 at 9-10), such that no inference of the impact of any alleged racial prejudice is logically or reasonably possible. In making these arguments, Chrysler often points to evidence that multiple other finance companies who were contacted, none of which are alleged by Plaintiffs to have acted for any discriminatory reasons, treated the Plaintiffs' respective applications in similar or identical manners. *See generally* D.E. 107 at 7, 10 (citing *Latimore v. Citibank*, 151 F.3d 712, 715-16 (7th Cir. 1998), which granted summary judgment on lending discrimination claim where

20

"no reasonable jury could find that . . . [plaintiff] was turned down because of her race")). Chrysler also points to evidence that the applications of at least some of the Plaintiffs appear to be infected by what appear to be materially false statements concerning the credit transactions at issue.

To be sure, Chrysler points to evidence, in varying strength as to the respective Plaintiffs, that it may well have had legitimate business reasons to treat the credit applications as they were treated. Three examples will illustrate the point. For Plaintiff Dampeer, for example, it is undisputed that four other finance companies—including Fifth Third Bank, which had been Ms. Dampeer's bank for over a decade—refused to approve her submitted credit application. These other financial institutions, none of which are alleged to be infected by racism, variously determined that Ms. Dampeer had excessive credit delinquencies, insufficient collateral in the proposed transaction, and excessive credit obligations in relation to her income. (D.E. 159 at 4 ¶ 3 (response).) For Plaintiff Eddie Tobias, it is undisputed that three other financial institutions declined to finance his purchase as proposed—variously explaining that Tobias had agreed to a purchase amount for the vehicle with Marquette that exceeded the bank's lending limits for the vehicle in question, that Tobias had delinquent credit obligations, and that there was inadequate collateral in the proposed transaction. (D.E. 157 at 4 ¶ 4 (response).) (One of the three companies rejected the proposed transaction outright, and two others, like Chrysler, conditionally approved the proposed transaction with modifications to the deal required for approval. (*Id.*, at 2 ¶ 3 (response); *id.* at 4 ¶ 4 (response)).) For Plaintiff Murray, two other finance companies declined to purchase his proposed contract—because, *inter alia*, Murray had very limited credit history and because his elderly mother, whom Marquette placed as a co-signer on the loan, had

21

insufficient credit history. (D.E. 153, at 3-4 ¶ 3 (response).) In this regard, Plaintiffs' own 30(b)(6) witness, from the Marquette dealership, testified that Plaintiff Murray "had no credit" and "had no trade liens where he established credit," and that as a result, credit bureaus did not have sufficient information "for them to give . . . him a rating." (*Id.*, at 5 ¶ 4 (response).)

In response to these arguments, Plaintiffs allege that Chrysler has engaged in a longstanding practice of virulent racial and ethnic discrimination concerning automobile financing applicants in Illinois and Iowa. Plaintiffs also allege at times that the discrimination involves "redlining," which is generally understood as "'the practice of financial institutions intentionally not lending to certain neighborhoods or parts of a community.'" *Crawford v. Signet Bank*, 179 F.3d 926, 318 n.4 (D.C. Cir. 1999) (quoting H.R. Rep. No. 104-103 at 177 (1995)).

As Chrysler points out, much of the "evidence" that Plaintiffs offer is patently inadmissible. For example, Plaintiffs repeatedly offer newspaper articles and unsworn letters, which are clearly not admissible evidence and must be disregarded under fundamental principles of summary judgment law. *See, e.g.*, *Cooper-Schut v. Visteon Automotive Sys.*, 361 F.3d 421, 429 (7th Cir. 2004).

Plaintiffs also repeatedly point to assertions made in a verified complaint in another, contemporaneously filed case, *Ridge Chrysler Jeep, L.L.C., d/b/a Marquette Chrysler Jeep, et al. v. DaimlerChrysler Services North America, L.L.C.*, No. 03 C 760 (N.D. Ill. filed Feb. 4, 2003). This verified complaint details, or at least purports to detail, a series of highly inflamatory and offensive racist statements by Chrysler financial managers in the Chicago area. This complaint was sworn to by Gerald Gorman, owner of the Marquette dealership where the Plaintiffs all purchased vehicles.

22

However, Chrysler accurately asserts that the evidentiary foundation for Mr. Gorman's

sworn assertions is, at least in some respects, suspect. The verified complaint purports to set

forth a number of actual quotes, as sworn to by Mr. Gorman. To satisfy the requirements of Rule

56, Mr. Gorman's proffered attestation must be based on his own personal knowledge and

establish that he is "competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

During his deposition, however, Mr. Gorman testified that he apparently compiled the sworn

"quotes" based on not only his memory, but the purported recollections of others and notes of

conversations, prepared at the direction of Mr. Gorman's legal team (which was led at the time

by Edward Vrdolyak, who signed the amended complaint (D.E. 135, Ex. B, at 53)); these notes

now have disappeared. (D.E. 205, Ex. 2 at 685,[9] 694; *see also id.*, Ex. 2 at 690-91, 693, 704-05.)

Nonetheless, in evaluating whether Chrysler has definitively established that

discrimination played no role in the putative financing transactions, in that Chrysler clearly

would have rejected or handled the applications in an identical manner irrespective of race, the

Court notes that at least two Chrysler employees have testified that Mr. Sirovy, the one-time (and

---

[9] Gorman, for example, testified as follows:

Q.     Be fair to say, though, that you were told by Ed Verdolyak that you should prepare notes
       of your meetings with Erv Sirovy where he used racial slurs, correct?

A.     Yes, Sir.

Q.     So it would be fair to say that you have no handwritten notes where Erv Sirovy called
       someone . . . [any number of inflammatory and offensive terms], correct?

A.     You know what? I thought I took notes, . . . but I can't find them, so the answer would be
       at this point, I don't have notes, no, sir.

D.E. 205, Ex. 2 at 685.

since fired) finance officer in the Chicago zone, was not shy about making racist comments. (*See* D.E. 135, Ex. D at 13-14; D.E. 205, Ex. 14 at 37, 99-101.) Although the evidence concerning Mr. Sirovy's racist comments is more extensive than the evidence relating to his replacement, Mr. Boggs, there is at least some testimony that Mr. Boggs made a racist comment concerning African Americans. (D.E. 135, Ex. D at 70-71.) While Chrysler argues that caselaw teaches that racist comments not specifically related to a challenged employment practice or business decision do not preclude summary judgment, in this case, there is at least some evidence that Mr. Sirovy made racist comments when referring to a Chrysler customer (D.E. 205, Ex. 14 at 37).[10] And it is undisputed that at least one financial analyst, after Sirovy was fired, was reprimanded by Chrysler for asking whether a particular credit applicant was white. (D.E. 205, Ex. 29 at 205-08.)

Under these circumstances, the Court cannot conclude that it would be impossible for a jury to find that the evidence of potentially legitimate business reasons for Chrysler's decisions does not preclude a finding that race might have also potentially influenced one or more credit transaction.[11] There also is at least some evidence that a Chrysler manager spoke in racist terms when referring to Chrysler customers, and the verified complaint (even acknowledging its shaky evidentiary foundation) alleges that the same managerial official remarked, *inter alia*, that "My

---

[10] To be fair, Chrysler also adduces substantial evidence from Chrysler financial analysts that Sirovy never directed anyone to look with disfavor on minority credit applicants when assessing the propriety of loans being processed through the Chrysler computer systems or through human review.

[11] In this regard, the Court notes that at least some of Plaintiffs' claims of "redlining" appear to be based more on assertions than fact, at least on the basis of the record assembled for the pending motions.

24

whole office knows that I don't buy nigger paper," which Plaintiffs suggest means that the Chrysler Chicago finance office understood that the manager did not provide financing for African-American customers. (D.E. 165 at 11 (quoting verified complaint, ¶ 29.)

The question of whether a proffered legitimate business reason is pretextual or not is often a question of fact. Given the evidence adduced concerning the statements of Chrysler employees concerning African Americans and African-American applicants, and crediting all credibility issues and inferences in the Plaintiffs' favor, the Court cannot conclude that the issue of legitimacy *vel non* of the respective proffered business reasons should be taken from the jury as to the Plaintiffs.

  3.  Evidence of Potential False or Fraudulent Statements in Connection with Credit Applications May Bear on the Propriety of Any Damages Award, but It Does Not Mandate Summary Judgment.

Chrysler points to evidence of potential false statements made in connection with at least some of the relevant credit applications as well as potentially fraudulent statements made to the Plaintiffs (and possibly financial institutions) by Marquette employees in connection with the automobile financings. Chrysler offers this evidence in rebuttal to Plaintiffs' contention that the fact that at least one financial institution agreed to finance the respective car purchases at issue is circumstantial evidence of discriminatory animus by Chrysler. More specifically, Chrysler argues that evidence of false or fraudulent statements in the Marquette applications demonstrates that any approvals by other financial institutions are not relevant because those institutions were operating on the basis of false information concerning the transactions and certainly would not have approved the transactions if they knew the true picture.

Chrysler's evidence of false statements is not insubstantial. For example, Plaintiff

25

Murray testified that when he bought his Jeep Liberty from Marquette in 2002, he was (seemingly falsely) told by Marquette's finance manager that Murray could get 0% financing on the transaction if Mr. Murray's mother co-signed on the deal. (D.E. 108, Ex. S at 76.) According to Mr. Murray, he and the salesman went to Murray's home between 9:00 and 10:00 that evening, woke up Mr. Murray's 82 year-old mother, and obtained her signature. (*Id.* at 79, 82.). According to Mr. Murray, the salesman did not inquire concerning Mrs. Murray's income, did not ask if she was employed or receiving social security, and did not explain what Mrs. Murray was signing. (*Id.* at 77, 82.) It appears that Mrs. Murray was falsely listed as the primary purchaser for the car and not as a co-signer, and when Mr. Murray defaulted on the loan, it appears that Harris Bank placed a $21,000 lien on Mrs. Murray's home. (*Id.* at 152-53.)

According to Mr. Murray, he told the Marquette salesman that he could not afford to buy the car unless he obtained 0% financing (*id.* at 76, 90); the actual financing for which he and his mother signed called for a 9.95% A.P.R. (*id.* at 106; *id.*, Ex. O at RID 00885), with 2.7% going to Marquette over and above the 7.25% that Harris Bank charged on the transaction (*id.*, Ex. N ¶ 13; *id.*, Ex. O at RID 00885).

Mr. Murray also testified that his credit application for the transaction falsely listed his monthly income as $4,300, when it actually averaged between $2,915 and $3,300, and that the credit application also falsely listed him as having various open credit accounts that did not actually exist. (*Id.*, Ex. S at 123-25, 147.) Mr. Murray also stated that he never told Marquette anything about his mother or her finances. (*Id.* at 123-25, 28.)

As a second example (and there are others), Plaintiff Eddie Tobias testified concerning evidence of potential fraudulent statements made to him. By way of background, Mr. Tobias did

26

not personally initiate any car purchase from Marquette (or related financing through Chrysler or anyone else). His daughter wanted to buy a car at Marquette, and, at least according to Mr. Tobias, after his daughter called him because she needed a co-signer (D.E. 112, Ex. CC at 19), Mr. Tobias was told by the Marquette salesperson that Tobias "would come off the payment" as co-signer after six months (*id.* at 49-50). Tobias explained that, at least in his view, the salesman "didn't tell the truth." (*Id.* at 57.) Not only was Tobias not removed as the co-signer, but evidence suggests that he in fact was the *only* person responsible for the debt in the Marquette transaction. (*Id.* at 91.) It appears undisputed that Tobias's daughter (who earlier had a car repossessed, even with lower payments) eventually defaulted on the car. The institution that financed the purchase, Harris Bank, sued Tobias for the deficiency (*id.* at 92), which eventually triggered Mr. Tobias having to file for bankruptcy (*id.* at 97-98).

The credit application that Marquette submitted in connection with the car financing, at least according to Mr. Tobias, has material misstatements of fact in it. For example, Mr. Tobias, who is retired, had a monthly income of some $1,135. Mr. Tobias testified that he did not, as the application reflects, tell Marquette that his monthly income was $4,000 ("[t]hat was false"). (*Id.* at 20-21.) He further testified that he did not tell Marquette that he had monthly rental income of $1,900 ("[t]hat was a false statement"). (*Id.* at 27.) And Mr. Tobias testified that he did not tell Marquette that his home was valued at $210,000, nor that he had $130,000 equity in the property. (*Id.* at 31; *Id.*, Ex. Z, RID 01046.)

Although the Court need not and does not definitively resolve this issue now, it is worth noting that the involvement and potential involvement of Marquette and its employees appears to be at least potentially at issue with respect to many if not all of the disputed financing

27

transactions involving the Plaintiffs. By way of background, it now appears undisputed—at least in the mind of Mr. Gerald Gorman, the owner of Marquette—that the Marquette dealership previously submitted many, if not dozens, of fraudulent credit applications to Chrysler. (*See, e.g.*, D.E. 205, Ex. 2 at 88-90, 1009-12.) To be precise, Mr. Gorman also suggested that his customers could also have been the source of any misstatements in the paperwork coming from his dealership. (*See id.* at 123 (Gorman affirming that "[the false information was put in by the people who were applying for credit or . . . [my] employees").)[12]

---

[12] Mr. Gorman, whose dealerships have sued in *Ridge Chrysler Jeep L.L.C. d/b/a Marquette Chrysler Jeep and Sales, Inc., et al. v. DaimlerChrysler Servs. North America, L.L.C.*, No. 03 C 760 (N.D. Ill. filed Feb. 3, 1990), is represented by the same legal team as Plaintiffs here. This arrangement appears to have been instituted by the former lead attorney for that team, Edward Verdolyak, who signed the initial complaints in both this case and the *Ridge* case. Mr. Verdolyak has since been disqualified by Orders of Judges Castillo, Anderson, and Keys, in both this case and the *Ridge* case, because of impermissible contacts with, and receipt of potentially privileged and confidential information from, the administrative assistant to Chrysler Financial's assistant general counsel. (D.E. 61 in this case; D.E. 135 in *Ridge* (Anderson Order disqualifying Mr. Verdolyak and any lawyer employed by him); D.E. 102 in *Ridge* (Keys report and recommendation that Mr. Verdolyak be disqualified). (To be entirely fair, almost all of the impermissible contacts at least, which were made in violation of a court order entered pending resolution of the disqualification issue, were made by a paid consultant of Mr. Verdoylak and not by Mr. Verdolyak himself (D.E. 61 at 4).) The administrative assistant in question has access to Chrysler's confidential and privileged legal materials; Mr. Verdolyak represented her in litigation against Chrysler; and Judge Castillo found that Mr. Verdolyak failed to rebut the legally applicable presumption that he received privileged and confidential information concerning this case in connection with that relationship. (D.E. 61 in this case, at 9-12; *see also* D.E. 135 in *Ridge* (Judge Anderson stating that "there is strong evidence that Mr. Verdolyak received confidential information about Chrysler's defense" from the administrative assistant).

In the disqualification litigation, Judge Castillo denied without prejudice Defendant's motion to disqualify Plaintiffs' remaining counsel (who did not review privileged information from the Chrysler legal affairs department) on grounds that their representation of Mr. Gorman and the Plaintiffs created a conflict of interest. (D.E. 61 at 14.) In so ruling, Judge Castillo noted that evidence reflected that the named Plaintiffs had consented to the dual representation. (*Id.*; *see also id.* (Judge Castillo encouraging remaining counsel to address potential conflict issues before seeking class certification). Finally, the Court notes that it appears from the record in this and the *Ridge* case that Mr. Gorman appears to be currently paying $10,000 per month to Mr. Verdolyak, under what Judge Keys described as a "side deal" arrangement that was particularly

28

Irrespective of whatever evidence shows that other finance companies may not, if they knew the actual situation, have financed the transactions in question, the Court still is sufficiently moved by evidence of Mr. Sirovy's comments and the (albeit more limited) evidence of race-based comments or slurs by others who worked at Chrysler in the wake of Mr. Sirovy such that the Court is unwilling to dismiss Plaintiffs' claims on the basis of legitimate business reasons as a matter of law. Relatedly, the evidence which is presently available that suggests that other finance companies (or Chrysler) might well have rejected Plaintiffs on the basis of any material misstatements in the Marquette credit applications bears more on the question of whether any actual or other damages are justified as to any Plaintiff's transaction, not whether Chrysler might have been acting upon such information at the time of any credit decision. *See Moore v. United States Dep't of Agriculture*, 55 F.3d 991, 995-96 (5th Cir. 1995) (after-acquired evidence concerning plaintiff's creditworthiness in discriminatory lending case does not bear on whether discrimination occurred but rather bears on damages questions) (citing *McKennon v. Nashville*, 513 U.S. 352, 356-62 (1995)); *Cullen v. Olin Corp.*, 195 F.3d 317, 324 (7th Cir. 1999) (similar teaching in the employment discrimination context) (citing *McKennon*, 513 U.S. at 359-60)).

4.    The Claim of Ms. Sims Is Dismissed for Failure to Adduce Evidence Sufficient For a Jury to Reasonably Conclude That She Actually Applied for Financing to Chrysler; the Claim of Mr. Coburn Is Not Dismissed.

---

"disconcerting" (D.E. 102 at 19) to Judge Keys and appeared to be "questionable on so many levels" (*id.*). The arrangement appears to have stemmed from Mr. Verdolyak's willingness to sign on a $2.5 million note financing Mr. Gorman's operations in 2000. (*Id.* at 18.) Judge Keys explained that Mr. Verdolyak never paid anything on the note, which has been refinanced, "thereby eliminating any risk to Mr. Verdolyak." (*Id.* at 19.) Mr. Verdolyak testified that he has been receivng the $10,000 monthly payments since 2000 and expects to receive the payments (or some $840,000 in total) from Mr. Gorman until 2007. (*Id.*) Judge Keys explained that under the arrangement, Mr. Gorman has and will be paying Mr. Verdolyak "$840,000 in exchange for, essentially, nothing." (*Id.*)

Chrysler argues that the claims of Ms. Sims and Mr. Coburn fail at the outset because those Plaintiffs have failed to adduce sufficient evidence that they even submitted a credit application or sought credit from Chrysler. After undertaking a detailed analysis of the relevant evidence, as discussed below, and after affording all reasonable inferences to the Plaintiffs, the Court finds that summary judgment is appropriate as to Ms. Sims and inappropriate as to Mr. Coburn.

The Court begins by reviewing the evidence generally applicable to both Plaintiffs. First, Plaintiffs do not contend that they personally can provide any evidence (or admissible evidence, at least; Plaintiffs' counsel offer some rank hearsay concerning Ms. Sims's application) indicating that credit applications concerning those individuals actually were submitted to Chrysler. Plaintiffs also do not dispute that Chrysler has no records reflecting that any applications for the two transactions in question ever were submitted to Chrysler. Nor do Plaintiffs dispute that, by way of contrast, Chrysler *does* have documentation (as Chrysler maintains it keeps for all applications that are actually submitted to it) concerning two prior financings that Chrysler accepted and approved for Ms. Sims and two different prior financings that Chrysler accepted and approved for Mr. Coburn. (D.E. 132 at 13 ¶ 2; D.E. 133 at 13-14 ¶ 2.) Instead, Plaintiffs essentially offer and point to vague writings in their respective "deal jackets" kept by Marquette. Plaintiffs point to these vague notations without offering *any* testimony from the salespeople actually involved in their transactions, either about these transactions specifically, or more likely, about those salespersons' general practices of making notes in customers' files.

By way of background, the failure to include testimony from any of the salespeople involved in the transactions likely is the product of suspicious circumstances concerning at least

30

many of Marquette's business transactions. In this regard, Mr. Gorman, the owner of Marquette, has repeatedly suggested in this case and in related litigation that the various material misstatements Gorman concedes were made in connection with prior Marquette/Chrysler sales were the work of either his salespeople, his underlying managerial staff, or the Marquette customers involved in the sales at issue. (*See, e.g.*, D.E. 205, Ex 2 (Gorman Dep) at 88 (testifying that "I never really could come to a conclusion of any one person that I suspected" in connection with the so-called Marquette "fraud deals" [. . . .] "I mean, I wish I could sit here and tell you today this is the guy that did it, let's get him arrested, and get on with this, but I can't say specifically"); *id.* at 89-90 (Mr. Gorman agreeing that the so-called Marquette "fraud deals" in fact "were fraud deals"); *id.* at 123 (Mr. Gorman testifying that "false information was put in by the people who were applying for credit or . . . [Gorman's] employees"); *id.* at 1009-10 (Gorman stating that altered invoices submitted in connection with Chrysler transaction "[a]bsolutely" reflected deceit and further stating that things did not "look good for Joe St. Germain," the General Manager for Mr. Gorman's two dealerships (D.E. 180 ¶ 117)); *id.* at 1011 (Mr. Gorman stating that, with respect to his general manager, "I believed as the owner of the store I hire people who I can trust to do their job honestly . . . but it is impossible for me to be able to watch 100 something, close to 200 employees and know every single thing they're doing"). Perhaps because of potential exposure for those involved in transactions involving potential fraud, neither "Tony G." (the apparent salesperson on the Coburn transaction), nor "Ben" (the apparent salesperson on the Sims transaction) has offered any testimony concerning the deals.[13] Again,

---

[13] It appears that there are various potential misrepresentations in the finance materials concerning the Marquette-Sims transaction. For example, Mr. Gorman himself concedes that the invoice relating to the Sims sale appears to have been altered. (D.E. 205, Ex 2 (Gorman Dep.) at

Plaintiffs instead suggest that opaque notes on or in the "deal jackets" are a sufficient basis to establish that credit applications were made on behalf of Ms. Sims and Mr. Coburn to Chrysler.

### A.     Summary Judgment Is Appropriate as to Ms. Sims

Ms. Sims fails, given the record she has presented, to adduce sufficient evidence that a credit application was submitted on her behalf to Chrysler such that Chrysler could have acted unlawfully against her. When a party moves for summary judgment on the ground, as Chrysler has done here, that there is an "absence of evidence" supporting the non-movant's case on an essential element of a claim, *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), "the burden shifts to the nonmoving party to show through specific evidence that a triable issue of fact remains on issues on which the nonmovant bears the burden of proof at trial." *Chemsource, Inc. v. Hub Group, Inc.*, 106 F.3d 1358, 1361 (7th Cir. 1997). The nonmovant in such circumstances "will be successful in opposing summary judgment *only when they 'present definite, competent evidence to rebut the motion.'" Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997) (quoting *Mesnick v. Gen'l Electric Co.*, 23 F.3d 576, 581 (1st Cir. 1994)) (emphasis added). As the Supreme Court has instructed, the nonmovant has the burden of adducing "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord, e.g., Smith*, 129 F.3d at 427 ("A party 'may not defeat a properly focused motion for summary judgment' by relying on evidence that is

---

1007-10 (casting blame on the General Manager).) Ms. Sims also testified that she neither signed the credit application that Marquette submitted for her to the company that financed the Sims transaction, ICUL (and which application may well have materially understated her monthly housing expenses by some 74%—D.E. 110, Ex. X (Sims Dep.) at 40, 151-53), nor authorized the salesperson at Marquette to sign the application on her behalf.

32

'less than significantly probative.'") (quoting *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994)). Under this standard, Ms. Sims's case fails.

Chrysler cannot have improperly handled Ms. Sims's credit application if no application was submitted to it. *See, e.g., Howard Oaks, Inc. v. Maryland Nat'l Bank, MNC*, 810 F. Supp. 674, 678 (D. Md. 1993) (plaintiff cannot show ECOA violation unless she establishes " a necessary predicate for such liability, *viz.* . . . submission of a 'completed application' under 12 C.F.R. § 202.1(f)"); *Dumas v. Sentinel Mort. Corp.*, No. 02 C 5255, 2003 WL 22859807, at *2, *4 (N.D. Ill. Dec. 2, 2003) (dismissing claims under the ECOA and Fair Housing Act where there was insufficient evidence that plaintiff ever applied for a loan with the defendant); *see also Cartwright v. Am. Sav. & Loan*, 880 F.2d 912, 927 (7th Cir. 1989) (affirming judgment for defendant in ECOA case where lender-defendant "never denied the 1980 loan application" because plaintiff asked lender to delay consideration of it).

Chrysler offers the following evidence in support of its contention that no credit application was ever submitted by Marquette for Ms. Sims in connection with her November 2001 purchase of a Chrysler 300M vehicle. Chrysler offers testimony without dispute that it has no records in its ACE financing system or elsewhere of Chrysler ever receiving any credit application concerning Ms. Sims in connection with the purchase. (D.E. 155 ¶ 4.) Ms. Sims likewise has no documents reflecting that any such application was made. (*Id.*) Chrysler also contends that if any application for credit is made to it, detailed information concerning the potential loan (such as the terms of the proposed sale, details concerning the new or used vehicle in question, and information about the customer) must be conveyed to Chrysler and automatically entered into its ACE credit evaluation system. (*Id.* ¶ 3 (citing D.E. 113, Ex. DD ¶¶ 10-11).)

33

Chrysler's financial records also reflect Ms. Sims's two prior credit applications that were submitted (and that were accepted by Chrysler). (D.E. 109 at 2 n.2 (citing D.E. 110, App. T ¶ 4).) The 30(b)(6) witness Ms. Sims offered from Marquette testified that he "[had] no idea" if Chrysler received an application concerning Ms. Sims. (D.E. 155 ¶ 4 (citing D.E. 113, Ex. DD at 184); *see also* D.E. 113, Ex. EE at 187 (Marquette 30(b)(6) witness testifying that he has no idea regarding whether a Marquette salesperson ever spoke to Chrysler in the first instance or received a call back concerning the Sims application).)

In response to all of this evidence, Ms. Sims does not put forth sufficient evidence for a jury to reasonably conclude in her favor that an application was submitted or made. The Court has carefully parsed the evidence Ms. Sims offers, and it finds the evidence insufficient.

First, Ms. Sims offers hearsay from the salesman with whom she was dealing. (*See* D.E. 155 at 5 ¶ 4 (response).) This evidence is inadmissible and cannot be considered. Even if one were inclined to disregard this prohibition, which the Court cannot, given the extensive indications in the record presented of salesperson fraud (including an altered invoice and other suspicious representations as to the Sims transaction itself), a layperson untutored in evidentiary niceties would not find the salesperson's hearsay to inspire confidence concerning the truth of his purported hearsay assertions. (In this regard, evidence in the record strongly suggests that Marquette and its salespeople, at least at times, selected financing for customers that maximized the dealer's profits, and not financing that led to the lowest rates for customers, as was claimed.)

Ms. Sims also points to a "call back" sheet that Marquette had in its files, which presumably (reading things charitably in her favor) reflects the notes of a sales or finance person who touched her transaction. Among the other scrawl on this sheet is the statement "CFC PASS

34

1700 SHORT" along with other scratchings concerning (she argues) other putative finance companies. (*See* D.E. 110, Ex. U, at RID 1057.) To the extent any of the writing suggests a conclusive answer about anything, it suggests that Harris Bank approved Ms. Sims for financing. Specifically, on the sheet, next to the word "Harris" is a checkmark in a box corresponding to the word "Qualify." (*Id.*) However, other evidence conclusively establishes that, in fact, Harris Bank declined Ms. Sims because she had insufficient credit references for the amount requested. (*Id.*, at RID 1055.) None of the boxes relating to credit decisions (*e.g.*, "Qualify," "Rejected") were checked on the sheet in the area corresponding to the "CFC" notation. (*Id.*, at RID 1057.) (This "CFC" notation seemingly, in Ms. Sims's view, relates to Chrysler.)

Ms. Sims also points out that Marquette's 30(b)(6) witness indicated that similar notations on a Marquette "call back" sheet concerning the Coburn transaction was proof that Chrysler was contacted on the Coburn transaction and passed on the deal, which Plaintiffs suggest should be interpreted to mean that Chrysler "passed on [turned down] the deal" concerning her. (D.E. 155, at 4 ¶ 4 (response) (alterations to quote added by Plaintiffs).) Even if the Court credits the 30(b)(6) witness's testimony concerning the Coburn document as establishing a sufficient foundation for the Sims document, the witness's testimony concerning the purported significance of the Coburn sheet cannot affect his express admission that he "[had] no idea" whether Chrysler received any Sims application, nor render the highlighted scrawl on the Sims sheet any more reliable or intelligible. (*Id.*)

Finally, Ms. Sims points to testimony of the 30(b)(6) witness suggesting that at the time of the Coburn transaction, sometimes the ACE system at Chrysler was not working so Marquette simply needed to call in applications over the phone. (*Id.*, at 5 ¶ 4 (response).) Ms. Sims also

points to related testimony from the Marquette 30(b)(6) witness, in which he stated that at the time of the Coburn transaction, Chrysler was not responding to credit applications from Marquette, so Marquette salespeople would phone in the transaction and it would be decided without inputting into the ACE system. (*Id.*)

This material also does not alter the result. First, the 30(b)(6) testimony concerns events in late June 2002, when Mr. Coburn bought his 2002 Jeep, not early November 2001, when Ms. Sims purchased her Chrysler 300M. This time gap is too long to make the evidence meaningfully probative, at least in light of the other evidence concerning events at the time of the Sims purchase. In this regard, the 30(b)(6) witness from Marquette elsewhere made clear that his testimony about Marquette salespeople likely having "phoned in" the deal to Chrysler and having no corresponding records created within the ACE system was based on his "surmise[s]" concerning what might have occurred. (D.E. 164, Ex. 4 at 210-11.) But documentary evidence makes clear that the witness's speculations are not worthy of any meaningful credence. Specifically, on the day that Ms. Sims's application was submitted to ICUL, automobile dealers in the Chicago zone submitted more than 400 applications to Chrysler which were recorded in the ACE system. (*Id.*, Ex. 1 ¶ 24.) Even more to the point, Marquette was actively employing the ACE arrangement. Marquette submitted five credit applications through ACE on November 8, 2001, of which two were approved. (*Id.*) Ms. Sims also presented no evidence casting any meaningful doubt on Chrysler's evidence that all transactions proposed to Chrysler are input into the ACE system.[14]

---

[14] Over and above all of these deficiencies, and independently, the ECOA requires that, in order for a person to have submitted a "completed" credit application, the creditor involved must have received "all of the information that the creditor regularly obtains and considers in

36

Simply put, this is an instance where Ms. Sims and her counsel have not produced sufficient admissible and meaningfully probative evidence to create a triable issue concerning a threshold aspect of Ms. Sims's suit. In such circumstances, precedent teaches that summary judgment is warranted. *See, e.g., Sybron Transition Corp. v. Security Ins. Co.*, 107 F.3d 1250, 1255 (7th Cir. 1997) ("A party must present more than mere speculation or conjecture to defeat a summary judgment motion."); *see also Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001).

B.     The Court Will Not Grant Summary Judgment as to Mr. Coburn

Chrysler also argues that it is entitled to summary judgment against Plaintiff Coburn on similar grounds. Chrysler's arguments are substantial. After carefully reviewing the specific evidence concerning the Coburn transaction, and after affording Mr. Coburn the benefit of all inferences, however, the Court respectfully rejects Chrysler's summary judgment request on this ground. There appears to be sufficient evidence, albeit barely enough, from which a reasonable jury might conclude that a credit application actually was submitted in connection with the Coburn transaction.

The material factual distinctions that nudge Mr. Coburn's situation over the line are as follows. First, Plaintiffs' foundational testimony concerning the deal jacket information at least relates to the Coburn document, and Plaintiffs' 30(b)(6) witness did not clearly disclaim any

---

evaluating applications for the amount and type of credit requested."  12 C.F.R. § 202.2(f). Nothing—other than pure speculation, which is impermissible—could support any inference that any salesperson involved in the Sims transaction would have communicated the sort of detailed credit information in connection with her car sale that Chrysler has established it reviewed before rendering a credit decision. (*See* D.E. 113, Ex. DD ¶¶ 10-11; *see also* D.E. 132, Ex. M at 185-86 (no idea what salesman who made notation meant by "pass").)

ability to intelligibly interpret the Coburn documentation. In addition, there are no indicia of material fraud concerning the Coburn transaction (as there were concerning the Sims transaction) that might lead any reasonable interpreter to question the reliability of any statements or documentation concerning the Coburn deal. Furthermore, when one parses the specific (and admittedly opaque) notations on the Coburn deal sheet, they reflect, or at least intelligibly can be read to suggest, that the transaction was "called in" and that Mr. Coburn "recently bought" a car through Chrysler. The latter information—that Mr. Coburn recently bought a car (in a transaction accepted and financed by Chrysler)—is at least true and gives some credibility to the putative business record. (D.E. 102, Ex. B at RID 01104-05, 09.)

To be sure, the 30(b)(6) witness's speculation about the ACE system being down and about Chrysler's supposed unwillingness to deal with Marquette appear, when measured against objective and seemingly indisputable computer evidence, to be clearly false. It appears that the ACE system received some 800 applications for loans in the Chicago zone during the two days that any Coburn request would have been submitted. (D.E. 164, Ex. 1 ¶ 25.) Six of those applications came from Marquette (of which four were approved for financing). (*Id.*)

Nonetheless, trial courts are reluctant to take issues from juries where they might, at least giving the plaintiff the benefit of all plausible inferences, find in the nonmovant's favor. Although the issue is very close, the Court denies the request for summary judgment against Mr. Coburn based on a detailed review of the specific evidence concerning his transaction.

       5.     Plaintiffs Apparently Cannot Prove Actual Damages, But They Might Be Able to Recover Attorneys Fees, Costs, or Nominal or Punitive Damages

Chrysler argues that the claims of each of the Plaintiffs should be dismissed because they

cannot show that any alleged discrimination caused them to suffer actual damages in connection with their automobile loan financings. Chrysler's arguments are predicated on examinations of, *inter alia*, the financing terms available through Chrysler for each vehicle at the time of the respective purchase, the length of the respective financing contract at issue, the amount of any rebate involved in the transaction, the credit history of the respective Plaintiff, and the range of special financing terms (if any) potentially available for the respective type of car on the purchase date. After reviewing these factors, Chrysler then determined the *best* possible rate that any person (of any race, ethnicity, age, or creed) could receive from Chrysler under such circumstances. (In multiple instances, Chrysler looked at the best possible rate under the credit rating Plaintiffs *specifically* allege they should have received, and at times, Chrysler looks at ratings even better than the Plaintiffs alleged.) Chrysler compared this best possible Chrysler financing rate against the rate that was actually obtained by the respective Plaintiff for his or her car financing. As Chrysler contends (and as Plaintiffs do not meaningfully dispute), the respective Plaintiffs will be unable to show any actual damages in connection with the disputed car financings because the respective finance terms obtained and/or available to the Plaintiffs were better than those they possibly could have received from Chrysler on the deals in question.

Two quick examples will suffice to show the dynamic at issue. Cassandra Haynes bought a 2002 Jeep Grand Cherokee from Marquette in February 2001. (D.E. 161 ¶ 1.) The contract that Ms. Haynes signed with Marquette called for a 10% A.P.R., a 72-month term, and a $2,750 buyer's rebate. (*Id.*) The actual rate charged by ICUL, which financed the deal, was 8%, leaving a 2% dealer's spread for Marquette. (*Id.*) In February 2001, Chrysler (the manufacturing entity) offered subvented financing on the 2002 Jeep Grand Cherokee only if the purchase involved,

39

*inter alia*, a contract of 60 months or fewer in duration, and a manufacturer's rebate of no more than $1,000. (*Id.* ¶ 6.) Therefore, as a result of the date of the sale and the manner in which the Marquette-Haynes purchase was structured, Chrysler only would have potentially financed the deal at standard rates. Chrysler Financial's standard buy rate on a 72-month deal for a person with Ms. Haynes's credit history was 9.6% (or 1.6% higher than the 8% buy rate ICUL offered.) (D.E. 106, App. J ¶ 6.) Moreover, even if Ms. Haynes had been offered credit terms corresponding to an "A+" credit rating within Chrysler, the buy rate Chrysler was offering on 72-month contracts for this vehicle in February 2001 was 8.75%, or .75% higher than the buy rate on the ICUL contract Ms. Haynes actually signed. (*Id.*, App. L at CFC 1312.) Plaintiff through her counsel does not meaningfully challenge the accuracy of Chrysler's math or the import of the financial numbers.[15]

Similarly, Vanessa Dampeer bought a 2002 Chrysler Sebring from Marquette in February 2002. (D.E. 159 ¶ 1.) The contract Ms. Dampeer signed with Marquette had an A.P.R. of 11% over a 72-month term. (*Id.*) Ms. Dampeer received two different rebates, one for $1,500 and a second for $500. (*Id.*) ICUL financed the Dampeer-Marquette contract, with a buy rate of 8%,

---

[15] The nuances of this transaction actually were more complicated, but they were simplified for ease of explanation. Chrysler actually contends, with documentary support, that Ms. Haynes was conditionally approved for a contract that offered alternative buy rates (all above 8%) depending on whether Ms. Haynes would increase her proposed down payment or not. (D.E 106, Ex. J ¶ 6; *id.*, Ex. L at CFC 954-55.) Marquette and Plaintiffs contend that "[i]f Chrysler Financial's records indicate that Ms. Haynes's was approved for financing, then it appears that their offer was never communicated to the Marquette Dealership." (D.E. 204 at 15 ¶ 3 (citing Gorman Affidavit).) Whether Ms. Haynes was conditionally approved, as Chrysler contends, or rejected outright, as Plaintiff and Marquette contend, the salient point for present purposes is that it appears clear that Ms. Haynes would never have received a better interest rate from Chrysler than she received from ICUL and thus cannot reasonably contend that actual damages are recoverable.

which left a 3% dealer's spread for Marquette. (*Id.*) There is no dispute that Chrysler refused to finance the contract.[16]

At the time of this car purchase, Chrysler was not offering subvented financing on the 2002 Sebring unless the contract was for 60 months or less and involved no rebate at all. (*Id.* ¶ 5.) As a result, the Dampeer-Marquette Sebring sale would not qualify for subvented financing under any circumstances and would have been subject to standard Chrysler rates. (*Id.* ¶¶ 6-7) Plaintiffs' amended complaint alleges that Ms. Dampeer should have qualified for a "B+" tier rate. (D.E. 180 ¶ 64.) Chrysler's standard buy rate on 72-month contracts for the Sebring corresponding to a "B+" tier was 8.75%, or some .75% higher than the rate actually provided by ICUL. (D.E. 104, App. F ¶ 12.) Again, there is no meaningful dispute between the parties that under such circumstances, Ms. Dampeer cannot demonstrate that she suffered any actual damages on the financing transaction as a result of the Chrysler denial.

Chrysler further similarly analyzes the financing transactions of all the other Plaintiffs. The Court will not review the particulars of all of these transactions, but notes that Chrysler argues (and, it appears, argues with substantial force) that similar results obtain concerning actual damages.

Chrysler argues that the Plaintiffs' seeming inability to show actual damages should result in summary dismissal of their suits. The Court respectfully disagrees. Chrysler contends that "[a] claim is not 'actionable' when, as here, there is 'no harm from the [alleged] prejudice.'"

---

[16] In Chrysler's view at least, it refused because Ms. Dampeer had a high debt-to-income ratio based on previous financings and other debt obligations. (*Id.* ¶ 2.) Plaintiffs claim that racism influenced the rejection.

(D.E. 109 at 8 (quoting *Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1262-63 (7th Cir. 1990).) But the ECOA by its plain terms does not appear to require that a plaintiff suffer actual damages in order potentially to prevail under that statute. Instead, the ECOA appears to contemplate that a plaintiff may obtain equitable relief, as well as costs and attorneys fees, and limited punitive damages "in addition to *any* actual damages." 15 U.S.C. § 1691e(b) (emphasis added); *see also* 15 U.S.C. §§ 1691e(c), (d). Thus, the statute does not mandate a showing of actual damages by its plain terms. *See generally Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (courts should presumptively apply the plain meaning of statutes); *Cent. States, S.E. and S.W. Areas Pension Fund v. Bell Transit Co.*, 22 F.3d 706, 710 (7th Cir. 1994) (same). In addition, in *Pinkett v. Payday Today Loans, LLC*, No. 99 C 3332, 1999 WL 592189 (N.D. Ill. 1999), Judge Zagel rejected an argument not dissimilar to Defendant's here and found that he potentially could "award punitive damages even if . . . [the plaintiff] does not plead actual damages" in the financial transactions at issue. *Id.*, at *1. Therefore, even if none of the Plaintiffs will be able to prove actual damages, as appears to be the case, that does not mean that the Plaintiffs are precluded from proceeding under the ECOA under any and all circumstances. Accordingly, the Court respectfully rejects Defendant's invitation to dismiss the Plaintiffs' suits because of their inability to show actual monetary damages.[17]

---

[17] Chrysler points to Supreme Court teaching, which instructs that an "award of punitive damages 'must bear a "reasonable relationship" to compensatory damages.'" (D.E. 154 at 15 n.9 (quoting *BMW of North America v. Gore*, 517 U.S. 559, 580 (1996))); *see also* 15 U.S.C. § 1691e(b) (requiring that the propriety of any award of punitive damages should be assessed in terms of, "among other relevant factors, the amount of any actual damages awarded"). Chrysler also cites *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003), which provides further guidance concerning factors that must be analyzed to ensure that any punitive damages award comports with Due Process Clause requirements. *See, e.g., id.* at 417-18. All of this teaching may bear on the question of whether punitive damages for Plaintiffs would be

## CONCLUSION

For the reasons set forth above, Defendant's motions for summary judgment are granted in part and denied in part. The Court grants summary judgment for Defendant as to Plaintiff Sims. The Court denies summary judgment as to the remaining Plaintiffs who are the subject of the summary judgment motions.

So Ordered.

_Mark Filip_
Mark Filip
United States District Judge
Northern District of Illinois

Dated: _March 31, 2005_

---

appropriate, or if so, in what amount, but a failure to show actual damages does not under the ECOA preclude a plaintiff from proceeding at all.